Mr. Chief Justice Marshall
delivered the opinion, of the Court, and, after stating the case, proceeded' as follows,:
At the close of the argument, a point was suggested, of shch vital importance, as to induce the Court to request that'it might be particularly.spo' ken to. ' That point is1, the right of the Bank to sue jn the Courts of the United-States. It has been argued, and ought to be disposed of, before •we proceed to the actual exercise of jurisdiction, by deciding on the rights of the parties.
Courts have iuitf'by^and “saan‘£st the
The appellants contest the jurisdiction of tne Court on two grounds:
1st. That the act of Congress has not given it
2d. That, under the constitution, Congress can-llOt give it.
1. The first part of the objection depends entirely on the language of the act. The words are, that the Bank shall be “ made able and capable in law,” “ to sue and be sued, plead and be im-pleaded, answer and be answered, defend and be defended, in all State Courts having competent ju^ ^diction, and in any Circuit Court of the Uni-States.”
These words seem to the Court to admit of but one interpretation. They cannot be made plained by explanation. They giye, expressly, the right to sue and be sued,” “ in every Circuit Court of the United States,” and it would be difficult to substitute other terms which would be more direct and appropriate foj' the purpose. The argument of the appellants is founded on the opinion of this Court, in The Bank of the United States v. DeveaUx, (5 Cranch, 85.) In that case it was decided, that the former Bank of the United States was not enabled, by the act which incorporated it, to sue in the federal Courts. The words of the jM. section of that act are, that the Bank may “ sue and be sued,” &c. “ in Courts of record, or any Other piaos whatsoever.” The Court was of opinion, that these general words, which are usual in all aets of incorporation, gave only a general capacity to sue, not a particular privilege to sue in the *818 Courts of the United Suites; and this opinion was strengthened by the circumstance that the 9th rule of the 7th section of the same act, subjects . , , the directors, m case of excess in contracting debt, to be sued in their private capacity, “ in aiiy Court of reeord of the United States, or either of them.” The express grant of jurisdiction to the federal Courts, in this case, was considered as having some influence on the construction of the general words of the 3d section, which does not mention those Courts. Whether this decision be right or wrong, it amounts only to a declaration, that a neral capacity in the Bank to sue, without mentioning the. Courts of the Union, may not give a right to sue in those Courts. To infer from this, that "words expressly conferring a right to sue in those Courts, do not give the right, is surely a conclusion which the premises do not warrant.
; The clause- or the Bank, which authorizes it to sue In the Circuit Court?, is con-i u uma.
The act of incorporation, then, confers jurisdiction on the Circuit Courts pf the United States, if Congress can confer it.
2. We will now consider, the constitutionality of the clause in the act of incorporation, which au- . • . . . 1 thorizes the Bank to sue m the federal Courts.
T . .. . • In support ot this clause, it is said, that the leg¡s]ativej executive, and judicial powers, of every well constructed government, are co-extensive with each other ; that is, they are potentially co-eften-sive. The executive department may constitutionally execute every law which the Legislature may constitutionally make, and the judicial department may receive from the Legislature the power of construing every such law. All govern- *819 merits which are npt extremely defective in their organization, must possess, within themselves, the means of expounding, as well as enforcing, their own laws. If we examine the constitution of the United States, we find that its framers kept this great political principle in view. The 2d article vests the whole executive power in the President; and the 3d article declares, “ that the judicial power shall extend to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority.”
This clause enables the judicial department to receive jurisdiction to the full extent of the consti tution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting on it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case, and the constitution declares; that the judicial power shall extend to all cases arising under the constitution, laws, and treaties of the United States.
The suit of The Bank of the United States v. Osborn and others, is a ease, and the question is,, whether it arises under a law of the United States ?
The appellants contend, that it does not, because several questions may arise in it, which depend on the general principles. of the law, not on any act of Congress.
If this were sufficient to withdraw a case from *820 the jurisdiction of the federal Courts, almost every case» although involving the construction of a law, would be withdrawn ; and a clause in the constitut¡onj re]ating to a subject of vital importance to the government, and expressed in the most comprehensive terms, would.be construed tornean almost nothing. There is scarcely any case, every part of which depends on the constitution, laws, or treaties of the United States. The questions, whether the fact alleged as the foundation-of the action, be real or fictitious; whether the conduct of the plaintiff has been such as to entitle him tp maintain his action; whether his right is barred; whether he has received satisfaction, or has in any manner released his claim's, are questions, some air of which may occur in almost every case; if their existence be sufficient to arrest the jurisdiction of the Court, words which seem intended be as extensive,.as the constitution, laws, and treaties of -the UnioB, which seem designed to tjie Courts of the government the construction all its acts, so far as they affect the rights of individuals, would be reduced to almost nothing.
Tn those cases in which original jurisdiction is given to the Supreme Court, the judicial power of the United States cannot be exercised in its appellate form. In every other case, the power is to be exercised in its original or appellate form, or both, as the wisdom of Congress may direct. With - the exception of these cases, in which original jurisdiction is given to this Court, there is none to which the judicial powder extends, from which the original jurisdiction of the inferior Courts is ex- *821 eluded by the constitution. Original jurisdiction, so far as the constitution gives a rule, is co-extensiVe with the judicial power. We find, in-the constitution, no prohibition to its exercise, in every case in :which the judicial power/can be exercised. It would bé a very bold construction to say, that this power could be applied. in its appellate form only, to the most important class of cases to which it is applicable.
The constitution establishes the Supreme Court, and defines its jurisdiction. It enumerates Cases in which its jurisdiction is original and exclusive ; and then defines that which is appellate, but does not insinuate, that in any such case, the power cannot be exercised in its original form by Courts of original jurisdiction. It is not insinuated, that the judicial power, in cases depending on the character of the cause, cannot be exercised in the first instance, in-the Courts of the Union, but must 'first be exercised in the tribunals of the State.; tribunals over which the government of the Union has no adequate control, and which may be closed to any claim asserted under a law - of the United States.
We perceive, then, no ground on which the proposition can be maintained, that Congress is incapable of giving the Circuit Courts original jurisdiction, in any case to which the appellate jurisdiction extends.
We ask, then, if it can be sufficient to exclude this.jurisdiction, that the case involves questions depending on general principles ? : A' cause may depend on several questions of fact ahd law. Some *822 of these may depend on the construction of a la w of the United States; others on principles unconnected with that law. If it be a sufficient foundation for jurisdiction, that the title or right set up by the party, may be defeated by one construction of the constitution or law of the United States, and sustained by the opposite construction, provided the facts necessary to support the action be made out, then all the other questions must be decided as incidental to this, which, gives that jurisdiction. Those other questions cannot arrest the proceedings. Under this construction, the judicial power of the Union extends effectively and beneficially to that most important class of cases, which depend on the character of the cause. On the opposite construction, the judicial power ,never can be extended to a whole case, as expressed by the constitution, but to those parts of cases only which present the particular question involving the construction of the constitution or the law. We say it never can be extended to the whole case, because, if the circumstance that other points are involved in it, shall disable Congress from authorizing the Courts of the Union to take jurisdiction of the original cause, it equally disables Congress from authorizing those Courts to take jurisdiction of the whole cause, on an appeal, and thus will be restricted to a single question in that cause ; and words obviously intended to secure to those who claim rights under the constitution, Jaws, or treaties of the United States, a trial in the federal Courts, will be restricted to the insecure remedy of an appeal upon an insulated ‘point, after it has *823 received that shape which may be given to, it by another tribunal, into which he is forced against his. will.
We think, then, that when a question to which the judicial power of the Union is extended by the constitution, forms an ingredient of the original cause, it is in the power of Congress to give the Circuit Courts jurisdiction of that cause, although other questions of fact or Of law may be involved in it.
The case of the Bank is, we think, a very strong case of this description. The charter of incorporation not only creates it, but gives it every faculty which it possesses. The power to acquire rights of any description, to transact business of any description, to make contracts of any description, to sue on those contracts, is given and measured by its charter, and that charter is a law of the United States. This being can acquire no right, make, no contract, bring no suit, which is not authorized by a law of the United States. It is not only itself the mere creature of a law, but all its actions and all its rights are dependant on the same law. Can a being, thus constituted, have a caso which does not arise literally, as well as substantially, under thé law ?
Take the case of a contract, which is put as the. strongest against the Bank.
When a Bank sues, the first question which presents itself, and which lies at the foundation of the cause, is, has this legal entity a right to sue? Has it a right to come, not into this Court particularly, but into any Court ? This depends on a- *824 law of the United States. The next question is, has this being a right to make this particular contract ?' If this question be decided in the negative, cause.jg determined against the plaintiff; and this question, too, depends entirely ona law of the United States. These are important questions, and they exist in every, possible case. The right to sue, if decided once, is decided for ever; but the power of Congress was exercised antecedently to the first decision on that right, and if- it was constitutional then, it cannot, cease to be*so, because the particular question is decided. It may be revived at the will of the party, and most probably would be renewed, were the tribunal to be changed.. But the. question respecting the right to make a particular contract, or to acquire a particular property, or to sue on account of a. particular injury, belongs to every particular case, arid may. be renewed in every case. The question forms an original ingredient in every cause. Whether it be^ in fact relied on or not, in the defence, it is still a part of the cause, and riiay be relied on. The right dfthe plaintiff to sue, cannot depend on the defence1 which the defendant may choose.to set up. His right to sue is anterior to. that defence, and must dépepd on the state Of things When the action :is brought. The questions which the case involves, then, must determine its Character, whether those questions be made iri the Cause or not.
The appellants say, that the case'arises on the contract; bat the validity of the contract depends on a law of’the United States, and the plaintiff is *825 compelled,, in every case, to. show its validity. The case arises emphatically under the law. The dct of Congress is its foundation^ The contract could never have. been made, but under the authority of that act. The act itself is the first ingredient in the case, is its origin, is that. from which every other part arises. That other questions may also arise, as the execution of the contract, or its performance, cannot change the case, or give it any other origin than the charter of incorporation. The action still originates in, and is sustained by, that charter.
The clause giving the B;ank a right to sue in the Circuit Courts of the United States, stands on the same principle with the acts authorizing officers of the United States who sue in their own names, to sue in the Courts of the United States. The Postmaster General, for example, cannot sue under that part of the constitution which gives jurisdiction to the federal Courts, in conséquence of the character of the party, nor is he authorized to sue by the Judiciary Act. He comes into the Courts of the Union under the authority of an act of Congress, the constitutionality of which can only be sustained by the admission that his suit is a case arising under a law of the United States. If it be said, that it is such a;case, because a law of the United States authorizes the contract, and authorizes the suit, the same reasons exist with respect to a suit brought by the Bank.' That, too, is such. a case; because that suit, too, is itself authorized, and is brought on a contract authorized by. a law of the United States. It depends abso-, *826 i aielyon hat law, and cannot mist a moment with - out its authority.
If it be said, that; a suit brought by the Bank maiy depend in fact altogether on questions unconnected with any law of the United States,, it is equally true, with respect, to suits brought by the Postmaster General. The plea in bar may be payment,” ifthe suit be brought on a bond, or non-* assumpsit, if it be brought on an open account, and no other question' may arise than. wbat. respects the complete discharge oí the . demand, üet the constitutionality of the act authorizing the Postmaster General to sue in the Courts .of the United States, has never been drawn into questions It is sustained singly by an act of Congress, stand-* ingon that construction, of the constitution, which asserts the right of the Legislature to give original jurisdiction, to the Circuit Courts, ip. cases arising under a law of the United States;
The clause in the patent lav?, authorising spits in thd Circuit Courts, stands, we think, bn'the same principle. Such a suit is a case arising under a law of the United States. Yet the defendant may not, at the trial, question the validity of the patent* or make any point which requires the construction of an act of Congress;. He may rest his defence exclusively on the fact, that he has hot violated the right of the plaintiff. That this feet becomes the sole question made in the cause, cannot oust the jurisdiction of the Court, or establish the position* that the case does not arise under á law of the United Staves.
Bis said, that a clear distinction exists between *827 the party and the cause; that the party, may originate under a law with whichNthe cause has nocod-nexion ; and that Congress may, with the same propriety, give a naturalized citizen, who is the mere-creature of a law, a right to sue in the Courts of the United States, as give that right to the Bank.
This distinction is not denied ; and, if the act of Congress was a simple act of incorporation, and contained nothing more, it might be entitled to great consideration. But the. act. does not stop with incorporating the Bank: It proceeds to bestow upon the being it has made, all the faculties and capacities, which that being possesses. Every act of the Bank grows out of this law, and is tested by it. To use the language of the constitution, every act of the Bank arises out of this law.
A.naturalized citizen is indeed made a citizen under an act of Congress, but the actdoes not proceed to gi ve, to regulate, or to prescribe his capa-citiés. He becomes a member of the society, possessing all the rights of a native citizen, and standing, in the view of the constitution, on the footing of a native. The constitution does not authorize Congressto enlarge or abridge those rights. 1 he simple power of the national Legislature, is to prescribe a uniform rule, of naturalization, and the exercise of this power exhausts it, so far as respects the individual. The constitution, then tases him up, and, among other rights, extends to him the capacity , of suing in the. Courts of the United States, precisely under the same circumstances under wfaieh a native might sue. He is *828 distinguishable in nothing from a native citizen, except so far as the constitution makes the distinction. The law makes none.
There is, then, no resemblance between the act incorporating the Bank, and the general naturalization law.
Upon the best consideration we have been able to bestow on this subject, we are of opinion, that the clause in the act of incorporation, enabling, the Bank to site in the Courts of the United States, is insistent with the constitution, and to be obeyed in all Courts.
Wé will now proceed to consider the merits of the cause.
The appellants contend, that the decree of the Circuit Court is erroneous—
1. Because no authority is shown in the record, from the Bank, authorizing, the institution or prosecution of the suit.
2. Because, as against the defendant, Sullivan, there are neither proofs nor admissions, sufficient to sustain the decree.
3. Because, upon equitable principles, the case made in the bill, does not warrant a decree against either Osborn or Harper, for the amount of coin and . notes in the bill specified to have passed through their hands.
4. Because, the defendants are decreed tcf pay interest upon the coin, when it. was not in the power of Osborn or Harper, and was stayed in the hands of Sullivan by injunction.
5. Because, the case made in the bill does not *829 warrant the interference of a Court of Chancery, by injunction.
How far a warrant of attorney, brother, authority, must be shown, to enable an attorney or solicitor to prosecute a suit.
6. Because, if any case. is made in the bill proper for the interference óf a Court.of Chancery, it is against the State of ?Ohio, in which case the Circuit Court could not exercise, jurisdiction.
7. Because, the decree assumes that the Bank of the United States is not subject to the taxing power óf the State of Ohio, and decides that the law of Ohio, the execution of which is enjoined, is unconstitutional.
These points will be considered in the order in which they are made.
1. It is admitted that a corporation can only appear by attorney, and it is also ¿dmitted, that the attorney must receive the authority of the corporation to enable him to represent it. It is not admitted that, this' authority must be under seal, On the contrary, the principle decided in the cases of the Bank of Columbia v. Patterson, &c. is supposed to applyto this case, and to show that the seal may be dispensed with. It is,' however, unnecessary to pursue, this inquiry, since the real question is, whether, the non-appearance of the power in the record be error, not whether the power was insufficient in itself.
Natural persons may appear in Court, either by themselves, or by their attorney. But no man has a right to appear as the attorney of another, without the authority of that other. In ordinary cases, the. authority must be produced, because there is, in the nature óf things, no prima facie evidence that- one man is in fact the attorney of another. *830 The case of an attorney at law, an attorney fop, the purpose of representing another in Court, and prosecuting or defending a suit in his name, is somewjjat different. The power must indeed exist, but its production has not been considered as indispensable. Certain gentlemen, first licensed by government, are admitted by order of Court, to stand at the bar, with a general capacity to represent all the .suitors in the Court. The appearance of any one of these gentlemen in a cause, has always been received as evidence of his authority; and ño additional evidence, so far. as we are informed, has ever been required. This practice, we believe, has existed from the first establishment of our Courts, and no departure from it has been made. in. those of any State, or of the Union.
The argument supposes some distinction, in this particular, between a natural person and a corporation; but the Court can perceive no reason for this distinction. A corporation, it is true, can appear only by attorney, while a natural person, may appear for himself. - But. when he waives this privilege, and elects to' appear by attorney, no reason is perceived why the same evidence should not be required, that the individual professing to represent him has authority to do so, which would be required if he were incapable of appearing in person. The universal and familiar practice, then, Of permitting gentlemen of' the profession to appear without producing a warrant of attorney, forms a rule, which is as applicable in reason, to their appearance for a corporation, asfor a natural person-. Were it even otherwise, the practice is *831 as uniform, and as ancient, .with, regard to corporations, as to natural persons. No case has ever occurred, so far as we are informed, in which the production of a warrant of attorney has been: sup-, posed-a necessary, preliminary to the appearance, of a corporation, either .as plaintiff or defendant, by a gentleman admitted to the bar of the Court.' The usage, then, is as full authority, for the case of a corporation?, as of .an individual. If this usage ought tobe altered,, it should bea: rule to operate prospectively, not by the reversal of a decree pronounced in conformity with the. general course of the Court, in. a case in which no doubt of the ler gality of the appearance had ever been suggested.
The answer of one defendant, when evidence.
.. In the statutes of jeofails and amendment, which respect this subject, the non-appearance of a warrant of attorney in the record, has generally been treated as matter of form; and the 32d section of the Judiciary Act may very well be construed to comprehend this formal defect in its general terms, in a case of law. No .reason is perceived why the Courts of Chancery should be more, rigid in .ex-, acting, (ho exhibition of a warrant of attorney than a. Court, of law* and, since the practice has, in fact, hoen the same in. both Courts, an appellate Court ought, we think, to be governed in both by the same rule.
2. The sécond. point' is one. on which tne productiveness of any decree,in favour of the tiffs most probably depends; for, if the claim be hot satisfied with the, money found in the possession of Smlivan. it is, at hest, uncertain whether *832 a fund, out of which it can be satisfied, is to be found elsewhere.
In inquiring whether the proofs or admissions in the cause be sufficient to charge Sullivan, the Court will look into the answer of Currie, as well as into that of Sullivan. In objection to this course, it is said, that the answer of one defendant cannot be read against another. This is generally, but not universally, true. Where ne defendant succeeds to anothér, so that the right of the one devolves on the other, and they become privies in estate, the rule is not admitted to apply. Thus, if an ancestor die, pending a suit, and the proceedings be revived against his heir, or if a suit be revived against an executor or administrator, the answer of the deceased person, or any other evidence, establishing any fact against, him, might be read also against the person who succeeds to him. So, a pendente lite purchaser is bound by the decree, without being even made a party to the suit; a for-tiori, ,'he would, if made a party, be bound by the testimony taken against the vendor.
In this casé, if Currie received the money taken out of the Bank, and passed it over to Sullivan, the establishment of this fact, in á suit against Currie, would seem to bind his successor, Sullivan, both as a privy in estate, and. ás a person getting possession pendente lite, if the original suit had been instituted against Currie. , We can perceive no difference, so far as respects the answer of Currie, between the case supposed, and the case as it stands. If Currie, who was the predecessor of Sullivan, admits that he received the money of *833 the Bank, the fact, seems to bind all those coming in under him, as completely as it binds himself. This, therefore, appears to the Court to. be a case in which, upon principle, the answer of may be read.
His answer states, that on or about the 19th or 20th of September, 1819, the defendant, Harper, delivered to him, in coin and notes, the sum of 98,000 dollars, which he was informed, and believed to be the money levied on the Bank as a tax, in pursuance of the law of the State of Ohio. After consulting counsel on the question, whether he ought to retain this sum within his individual control, or pass it to the credit of the State on the books of the treasury, he adopted the latter course, but retained itcarefully in a trunk, separate from the other funds of the treasury; The money afterwards, came to the hands of Sullivan, the gentleman who succeeded him as treasurer, ánd gave him a receipt for all the money in the treasury, including' this, Which was still kept separate from the rest.
We think no reasonable doubt can be entertained, but that the 98,000 dollars, delivered by Harper to Currie, were taken out of the Bank. Cur-rie understood.and believed it tobe the fact. When did he so understand and believe it? At the time when he received the money. And from whom did he derive his understanding and belief? The inference is irresistible, that he derived it from his own knowledge of circumstances, for they were of public, notoriety, and from the information of Harper. In the necessary course of things, Harper, who was sent, as Currie must have known, on this *834 business, brings with him' to the treasurer of the State, a sum of money, which, by the law, was io be taken out of the Bank, pays him 98,000 dollars thereof, which the treasurer receives and keeps, as being money taken from the Bank, and so enters it on the books of the treasury. In a suit brought against Mr, Currie for this money, by the State of Ohio, if he had failed to account for it, could any person doubt the competency of the testimony.tó charge him ? We think no mind could hesitate in such a case.
Currie, then, being clearly in possession of this money, and clearly liable for it, we are next* to look into Sullivan’s answer, for the purpose of inquiring whether he.admits any facts which show him to be liable also.
Sullivan denies all .personal knowledge of the transaction ; that is, he was not in office when it took place, and was not present when the money was taken out of the Bank, or when it was delivered to Currie. But when he entered the treasury office, he received this sum of 98,000 dollars, separate from the other money of the treasury, which, he understood from report, and was informed by his predecessor, from whom he received it,, was the money taken out of the Bank. This sum has remained untouched ever since, from respect to the injunction awarded by the Court.
We ask, if a rational doubt can remain on this subject.
Mr. Currie, as treasurer of the State of Ohio, receives 98,000 dollars, as being the amount of a tax imposed by the Legislature of. that State on *835 ihe Bank of the United States; entere the same on the books of the treasury; and, the legality of the act by which the money was levied being ques- . % t ,J ,, • ' turned, .puts it m a trunk, and keeps it apart irom the other money belonging to the public. He resigns his office,.and is succeeded by Mr. Sullivan, to whom he delivers the money, informing him, at the same time, that it is the money raised from the Bank; and Mr. Sullivan continues to keep it apart, and abstains from the use of it, out of re* spect to an injunction, forbidding him to pay it away, or in any manner to dispose ofi.t.- Is it possible to doubt the identity of this money ?
Even admitting that the answer of Currie, though establishing his liability as to himself, could not prove even that fact as to Sulliyan ; the answer of Sullivan is itself sufficient, we think, to charge him. He admits that these -98,000 dollars were delivered to him, as being the money which was taken out of the Bank, and that he so received it.; for, he says, he understood this sum was the same as charged in the bill; that his information was from report, and from his predecessor; and that the money has remained untouched, from respect to the injunction. This declaration, then, is a part of the fact. The fact,, as admitted in his answer, is not simply that he received 98,000 dollars, but that he. received 98,000 dólíars, as being the money taken out of the Bank — the money to which the writ of injunction applied.
In a. common action between two private individuals, such an admission would, at least, bé sufficient to throw on. the defendant the burthen of *836 proving that the money, which be acknowledges himself to have received and kept as the money of the. plaintiff, was not that which it was declared to be on its delivery. A declaration, accompanying the delivery, and constituting a part of it, gives a character to, the transaction, and is not to be placed on the same footing with a declaration made by the same person at a different time. The answer of Sullivan, then, is, in the opinion of the Court, .sufficient to show that these 98,000 dollars were the specific dollars for which this suit was brought. This sura having come to his possession with full knowledge of the fact, in a-separate trunk, unmixed with money, and with notice that an injunction had been awarded respecting it, he wou|d seem to be responsible to the plaintiff for it, unless he can show sufficient matter to discharge himself.
Responsibility of the parties against whom the bill was taken pro confesso.
3. The next objection is, to the decree against > , __ . , . ... ® Osborn and Harper, as to whom -the bill was ta- ¶ ' - j ken iqt confessed*
The bill charges!? that Osborn employed John L. Harper to collect the tax, who proceeded by violence to enter the office of discount and deposit at Chilicothe, and forcibly took therefrom 109,000 dollars in specie and bank notes; and that, at the time of the seizure, Harper well knew, and was duly notified, that an injunction had been allowed, which money was delivered either to Currie or Osborn.
So far as respects Harper and Osborn, these allegations are to be considered as true. If the act of the Legislature of Ohio, and the official *837 character of Osborn, constitute a defence, neither of these defendants are Hablé, and the whole decree is erroneous; but if the act be unconstitu-* tional and void, it can be no justification, both these defendants are to "be considered as individuals who are amenable to the laws. Considering them, for . the present, in this character, the fact, as made out in the bill, is,1 that Osborn employed Harper to do an illegal act, and that Harper has done that act; and that they are jointly responsible for it, is supposed to be as well settlec as any principle of law whatever.
Interest will not be decreed against a party, upon money which he is enjoined from using.
We think it unnecessary, in this part of the case, to enter into the inquiry respecting the effect of the injunction. No injunction is necessary to attach responsibility on those who conspire to do an illegal act, which this is, if not justified by the authority under which it was done.
4. The next objection is, to the allowance of . , .... . , „ , interest on the coin, which constituted a part ot the sum decreed to the complainants. Had the complainants, without the intervention of a Court of equity, resorted to their legal remedy for the injury sustained, their right to principal and interest would have stood on equal ground. The same rule would be adopted in a Court of equity, had the subject been left under the control of the party in possession, while the right wets in litigation. But the subject was not left under the control of the party. The Court itself interposed, and forbade the person, in whose possession the property was, to make any use of it. This order having been obeyed, places the defendant in the same *838 situation, so far as respects interest, as if the, Court had taken the money into its own custody. The defendant, in obeying the mandate of the Court, becomes its instrument, as entirely as the Clerk of the Court would have been, had the money been placed in his hands. It does not appear reasonable, that a decree which proceeds upon the idea, that the injunction of the Court was valid, ought to direct'interest to be paid on the money which that injunction restrained the defendant from usinsr.
Case made in the bill, proper for an injunction, and other equitable relief.
5* The fifth objection to the decree is, that the case made in1 the bill does not warrant the irffer- ' ^erenCe °-f & Court of Chancery-
In examining this question, it is proper that the Court should consider the real caso, and its actual circumstances. The original bill' prays for an in-, junction against Ralph- Osborn, Auditor of the State of Ohio, to restrain him from- executing a law of that State, to the great oppression and injury of the complainants, and to the destruction of rights and privileges conferred on them by their charter, and by the constitution of the United States. . The true inquiry is, whether an injunction can be issued to restrain a person, who is a State officer, from performing any official act enjoined by statute; and whether a Court of equity-can decree restitution, if the act be performed-. In pursuing this inquiry, it must be assuméd; for the present, that the act is unconstitutional, and fufj nishes no authority or protection to the officer who is about to proceed under it. This must be assumed, because, in the arrangement of his argil *839 raent, the counsel who opened the cause, has chosen to reserve that point for the last, and to contend that, -though the law be void, no case is made out-against the defendants. We suspend, also, the consideration of the question, whether the interest of ihe State of Ohio, as disclosed in the bill, shows a want of jurisdiction in the Circuit Court, which ought to have arrested its proceed* ings. That question, too, is reserved-by the appellants, and will be subsequently considered. The sole inquiry, for the present, is, whether, stripping the case of these objections,, the plaintiffs below were entitled to relief in a Court of equity, against the defendants, and to thé. protection of an injunction. The appellants expressly waive the extravagant proposition, that a void act can afford protection to the person who executes it, and admits the liability of the defendants to the plaintiffs, to the extent of the injury sustained, in an action at law. The question, then, is reduced to the single inquiry, whether the case is cognizable ima Court of equity. If it is, the decree must be affirmed, so far as it is supported by the evidence in the cause.
The appellants.allege, that the original bill’contains, no allegation which can justify the application for an injunction, and treat the declarations of Ralph. Osborn, the Auditor, that he should execute-.the law;, as the light and frivolous threats of an. individual, that he would commit an ordinary trespass; But surely this is not the .point of view in which the application for an injunction is to be considered. The‘Legislature of Ohio had passed *840 a law for the avowed purpose of expelling the Bank from the State; and had made it the duty of the Auditor to execute it as a ministerial officer. He had declared that he would perform this duty!. The law, if executed, would unquestionably effect its object, and would deprive the Bank of its chartered privileges, so far as they were to be exercised in tfyat State. It must expel, the Bank from the State; and this is, we think, a conclusion which the Court might rightfully draw from the law itself. That the declarations of the Auditor'would be fulfilled, did. not admit of reasonable doubt. It was to be expected, that a person continuing to hold an office, would perform a duty enjoined by his government, which was completely within his power. This duty was to be repeated until the Bank should abandon the exercise of its chartered rights.
To treat tms as a common casual trespass, would be to disregard entirely its true character and substantial merits. The application to the Court was, to interpose its writ of injunction, to protect the Bank, not from the casual trespass of an individual, who might not perform the act he threatened, but from the total destruction of its franchise, of its chartered privileges, so far as respected the State of Ohio. It was morally certain, that the Auditor would proceed to execute the law, and it was morally certain, that the effect must be the expúlsion of the Bank from the State. An annual charge of 100,Q0G dollars, would, more than absorb all the advantages of the privilege, and would consequently annul it.
*841 The appellants admit, that injunctions are often awarded, for . the. protection of parties in the enjoyment.of a franchise; but deny that one has ever been granted in such a case as this. But, although the precise case may never have occurred, if the same principle, applies, the same remedy ought to be afforded. The interference of the Court in this class of cases, has most frequently been to restrain á person from violating an exclusive privilege, by participating in it. But if, instead of a continued participation in the privilege, the attempt be to disable the party from using it, is ndt the reason for the interference of the Court rather strengthened than weakened? Had the privilege of the Bank been exclusive, the argument, admits that any other person, or company, might have been enjoined, according to the regular course of the Court of Chancery, from using or exercising the same business. Why would such person Qr company have been enjoined ? To píre-venta permanent injury from being done to the party entitled to the franchise or privilege; which injury, the appellants say, cannot be estimated in damages. It requires no argument to prove, that the injiiry is grea'ter, if the whole privilege be destroyed, than if it be divided; and, so far as respects the estimate of damages, although precise accuracy may not be attained, yet a reasonable calculation may be made of the amount of the injury, sd as to satisfy the Court "and Jury." It will not be pretended, that, in such a case, an action at law. could not be maintained, or that the materials do not ' exist on which a verdict, might be *842 found,'and a judgment rendered. But in this, and many other cases of continuing injuries, as in the case of repeated ejectments, a Court of Chancery wj¡| interpose. The injury done, by denying to the Bank, the exercise of its franchise in the State of Ohio, is as difficult to calculate, as the injury done by participating in an exclusive privilege. The single act of levying the tax in the first instance, is the cause, of an action at law ; but that affords a remedy only for the single act, and is not equal to the remedy in Chancery, which prevents its repetition, and protects the privilege. The eawe. conservative principle, which' induces the Court to interpose its authority for the protection of exclusive privileges, to prevent the commission of waste, even in some cases of trespass, and in many cases of destruction, will, we think, apply to this. Indeed, trespass is destruction, where, there is no privity of estate.
If the State of Ohio could have been made a party defendant, it can scarcely be denied, that this would be a strong c&se for an injunction. The objection is, that, as the real party cannot be brought before .the Court, a suit cannot be sustained against the agenda of that party; and cases have been cited, to show that a Court of Chancery will not make a decree, unless all those who are substantially interested, be made patties to the suit. "
This is certainly true, where it is in the power of the plaintiff to make them parties; but if the person who is the real principal, the person who is the true source of the mischief, by whose power and for "whose advantage it is done, be himself *843 above the law, be exempt from all judicial process, it would be subversive of the best established principles, to say th,at the laws could not .afford the same remedies against the agent employed in doing the wrong, which they would afford against him, could his principal be joined in the suit. ^ It is admitted, that the privilege of the principal is not communicated to the agent; for the appellants acknowledge that an action at law would lie against the agent, in which full compensation ought to be made for the injury. It being admitted, then, that the agent is not privileged by his connexion with his principal, that he is responsible for his own act, to the full extent of the injury, why should not the preventive power of the Court also be applied to him ? Why may it not restrain him from, the commission of a .wrong, which it would punish him for committing ? We put out of view the character of the principal as a sovereign State, because that is made a distinct point, and consider the question singly as respects the want of parties. Now, if the party before the Court, would be responsible for the whole injury, why may he not be restrained from its commission,, if no other party can be brought before the Court ? The appellants found their distinction on the legal principle, that all trespasses are several as well as joint, without inquiry into the validity of this reason, if true. We ask, if it be true ? Will it be said, that the action of trespass is the only remedy given for this injury ? Can it be denied, that an action on the case, for money had and received to the plaintiff’s use, might be maintained f *844 We think it cannot; and if such an action might maintained, no plausible reason suggests itself to us, for the opinion, that an injunction may not awar(je(j restrajn the agent, with as much propriety as it might be awarded to restrain the principal, could the principal be made a party.
We think the reason for an injunction is much stronger in the actual, than it would be in the supposed case. In the regular course of things, the agent would pay over the money immediately to his principal, and would thus place it beyond the reach of the injured party, since his principal is not amenable to the law. The remedy for the injury, would be against the agent only; and what agent could make compensation for such an injury? The remedy would have nothing reál in it. It would be a remedy in name only* not in substance. This alone would, in our opinion, be a sufficient Reason for a Court of equity The injury would, in fact, be irreparable,; and the cases are innumerable, in which injunctions are awarded on this ground.
But, .were it even to be admitted, that the injunction, in the first instance, was improperly awarded, and that the original bill could not be maintained, that would ,not,. we think,;, materially affect the case- An. amended and supplemental bill,, making new parties, has been filed in the cause, and on that bill, with the proceedings under it, the decree.was pronounced. The question is, whether, that bill and those proceedings support the decree.
The case thev make, is, that the money and *845 notes of the plaintiffs, in the Circuit Court, have been taken from them Without authority, and are in possession of one of the defendants, who keeps them separate and apart from all other money and notes, it is admitted, that this defendant would be liable for the whole amount in an action at law; but it is denied that he is liable in a Court of equity.
We think it a case in which a Court of equity ought to interpose, and that there are several grounds on which its jurisdiction may be placed.
One, which appears to be ample for the purpose, is, that a Court will always interpose, to prevent the transfer of a specific article, which, if transferred, will bes lost to the owner. Thus, the holder of negotiable securities, indorsed in the usual manner, if he has acquired them fraudulently, will be enjoined from negotiating them; because if negotiated,, the maker or indorser must pay them. Thus, too, a transfer of stock will be restrained in favour of a person having the real property in. the article. In these cases, the_ -injured party would have his remedy at law; and the probabili-. ty that this remedy would be adequate, is stronger in the cases put in the books, than in this, where the sum is so greatly beyond the capacity of an ordinary agent to pay. But it is the province of a Court of equity, in such cases, to arrest the injury, and prevent the wrong. The remedy is.more beneficial and complete, than the law can give. The money of the Bank, if mingled with the other mo *846 ney in the treasury, and put into circulation, would be totally lost to the owners; and the reason for an injunction is, at least, as strong in such a case, gg jn ^ cage a neg0(;ia|j|e note.
The exemption of the State from sustability, no objection to the proceedings against its officers, for executing an unconstitutional law.
6. YVe proceed now. to the 6th point made by the appellants, which is, that if any case is made . / „ . J in the bill, proper tor the interference of a Court of Chancery, it is against the State of Ohio, in case the Circuit Court could not exercise jurisdiction.
The bill is brought, it is said, for the purpose óf protecting the Bank in the exercise of a franchise granted by a law of the United States, which franchise the. State of Ohio asserts a right to invade, and is about to invade. It prays the aid of the Court to restrain the officers of the State from executing the law. It is, then, ¿ controversy between the Bank and the State of Ohio. The interest of the State is-direct and immediate, not consequential. - The process of the Court, though not directed against the State by name, acts directly upon it, by restraining its officers. The process, therefore, is substantially, though ’not in form, against the State, and the Court ought not to proceed ’without making the State a party. If this cannot be done, the Court cannot take jurisdiction of the cause.
The full pressure of this argument is felt, and the difficulties it present's are acknowledged. The direct interest of the State in the suit, as brought, is admitted.; and, had it been in the power of the Bank to máke it a party, perhaps no decree otight to have been pronounced in the cause, until the *847 ¡State was before the Court. But this was notin the power of the Bank. The eleventh amend- - , .... . ' ment oí the constitution has exempted a State from the suits of citizens of other States, or aliens; and the very difficult question is to be decided, whether, in such a case, the Ceurt may act upon the agents employed by the State, and.on the pro-t perty ih their hands.
Before we try this question by the constitution, it may not be time misapplied, if we pause for a moment, and reflect on the relative situation of the Union with its members, should the objection prevail.
A.denial of jurisdiction forbids all inquiry into the nature of the case. It applies to cases perfectly clear in themselves; to cases where the government is in the exercise of its best established and most essential powers, as well as to those which, may be deemed questionable. It asserts, that the agents of a State, alleging the authority of a law void ih itself, because repugnant to the constitution, may arrest the execution of any law in the United States.. It maintains, that if a State shall impose a fine or penalty on- any person employed in the execution of any law of the United States, it may levy that fihe or penalty by a ministerial officer, without the sanction even of its own Courts; and that the individual, though.he perceives the approaching danger, can obtain no protection from the judicial department of the government. .■ The carrier of the mail, -the collector of the revenue, the marshal of a district, the recruiting officer, may all be inhibited, under ruinous *848 penalties, from the performance of their respectivo duties; the warrant of a ministerial officer may aut^or‘ze ^ Collection °f these penalties, and the person thus obstructed in the performance of his duty, may indeed resort to his action for damages, after the infliction of the injury, but’cannot avail himáelf of the preventive justice of the nation to protect him in the performance of his duties. Each member of the Union is capable, at its will, of attacking the nation, of arresting its progress at every step, of acting vigorously and effectually in the execution of its designs, while the nation stands.naked, stripped of its defensive armour, and incapable of shielding its agent or executing its laws, otherwise than by proceedings which are to take place after the mischief is perpetrated, and which must often be ineffectual, from the inability of the agents to make compensation.
These are said to be extreme cases; but the case at bar, had-it been put by way of illustration in argument, might have been termed an extreme case ; and, if a penalty on a revenue officer, for performing his duty, bé more obviously wrong than a penalty on the Bank, it is a difference in degree, not in principle. Public sentiment would be more shocked by the infliction of a penalty on a. public officer for the'performance of his duty, than by the infliction of this penalty on a Bank, which, while carrying on the fiscal operations of the government, is also transacting its own business ; but, in. both cases, the. officer léVyin^ the penalty acts under a void authority, and the power *849 to restrain hint is denied as positively in the one as in the other.
The distinction between any extreme case; and that which has actually occurred, if, indeed, any difference of principle can be supposed to exist between them, disappears, when considering the question of jurisdiction; for,, if the Courts^ of the United Stales cannot rightfully protect the agents who execute every law authorized by the constitution, frbm the direct action of State agents in the collection of penalties, they cannot rightfully pro-, tect those who execute any law.
The question, then, is, whether the constitution of the United States has provided a tribunal which. can peacefully and rightfully protect those who are employed in carrying into execution the laws of the Union, from the attempts of a particular State, to resist, the execution of those laws.
The State of Ohio denies the existence of this power, and contends, that no preventive proceedings whatever, or proceedings ^against the very property which may have been seized by the agent; of a State, can be sustained against such agent, because they would be substantially against the, State itselfj in violation of the 11th amendment of the constitution.
That the Courts of the Union cannot entertain a suit brought against a State, by an alien, or the citizen of another State, is not to be controverted. Is a suit, brought against an individual, for any cause. whatever, a suit against a State, in the sense of the constitution ?
*850 The 11th - amendment is the limitation of a power supposed lo.be granted in the original in-strumcnt; and to understand accurately the extent 0y tj1(J potation,, it seetns proper to define the power that is limited.
The words of the constitution, so far as they respect this question; are, “ The judicial-power shall extend to controversies between two or more States, between a State and. citizens of another State, and between a State and foreign states, ci-: tize.ns, or subjects.”
A subsequent clause distributes the power previously granted, and assigns to the Supreme Court original jurisdiction in those cases in which “ a State shall be a party.”
The words of The 11th amendment are, “The judicial. power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States, by citizens of another. State, or by citizens or subjects of a foreign state.”
The, Bank of. the United States contends, that in all cases in which jurisdiction depends on the character of the party, reference is made to the party on the record, not to one who may be interested; but is not shown by the record to be a party.
The appellants admit, that the jurisdiction of the Court is not ousted by any incidental or consequential interest, which a State may. have in the decision tp be made, but is to be considered as a party, where the decision ac.ts directly and immediately upon the State, through its officers.
*851 If this question were to be determined on thé authority of English decisions, it is believed' that no case can be adduced, where any person has been considered as a party, who is not made so in the record. Rut the Court will not review those decisions, because if is thought a question growing oiit of the constitution of the United States, requires rather an attentive consideration of the words of that instrument, than of the decisions of analogous questions by the Courts of any other country.
Do the provisions, then, of the . American constitution, respecting controversies to which a State may be a party, extend, on a fair construction of that instrument, to cases'in which the' State is not a party on the record ?
The first in. the enumeration, is .a controversy between two or more States.
There are not many questions- in which á State would.be supposed, to take a deeper or moreim-. mediate interest, than in those which decide on the extent of her .térritory. - Yet the constitution, not considering the State as a party to such controversies, if not plaintiff or.defendant on the record, has expressly given jurisdiction in thpse between citizens claiming,, lands under grants of different States. If each State, in consequence of the' influence of a decision on her boundary, had. been considered, by the framers of the constitution, as a party to that controversy, the express grant of jurisdiction would have been useless. The grant of it certainly proves, that the cónstitu *852 tion docs not consider the State as a party in such a case-
Jurisdiction is expressly granted, in those cases only where citizens of the samé State claim lands under grants of different States. If the claimants be citizens of different States, the Court takes jurisdiction for that reason. Still, the right of the State to grant, is the essential point in dispute: and in that "point the State is deeply interested. If that interest converts the State into a party, there is an end of the cause ; and the constitution will be construed to forbid the Circuit Courts to take cognizance of questions to which it was thought necessary expressly to extend their jurisdiction, even when the controversy arose between citizens of the same State.
We are aware, that the application of these ca-. ses may be denied, because the title of the State comes on incidentally, and the appellants admit the jurisdiction of the Court, where its judgment does hot act directly upon the property or interests of the State ; but we deéméd it of some importance to show, that the framers of the constitution contemplated the distinction between cases in which a State was interested, and those in which it was a party, and made no provision for a case of interest, without being a party on the record. ‘
In cases where a State is a party on the, record, the question of jurisdiction is decided, by inspection. ^ If: jurisdiction depend, not on, this plain fact, but on rthe interest, .of the State, what rulé has the' constitution given, by which; this interest *853 is to be measured? If no. rule be given, is it to. be settled by the Court ? If so, the curious anomaly is presented, of a Court examining the whole testimony of a cause, inquiring into, and deciding on* the extent of a State’s interest, without having a right to exercise any jurisdiction in the case. Can this inquiry be made without the exercise of. jurisdiction ?
The next ip the enumeration, is a controversy between a State and the citizens of another State.
Can this case arise, if the State be not a party on the. record ? If it can, the question recurs, what degree of interest shall be sufficient to change the parties, and arrest the proceedings against the individual ? Controversies respecting boundary have lately existed between Virginia and Tennessee, between Kentucky and Tennessee, and now exist between New-York and New-Jersey. Suppose, while such a controversy is pending,, the collecting officer of one State should seize property for taxes belonging to a» ían who supposes himself to reside in the other State, and who seeks redress in the federal Court of that State in which the officer resides. . The interest of the State is obvious. Yet ii is admitted, that in such a case the action would lie, because the officer might be treated as a trespasser, and the verdict and judgment against him would not act directly on the property of the State. That it would not so act, may, perhaps,. depend on circumstances. The officer may retain the amount of the.taxes in his hands, and, On the proceedings of the State against him, may plead in bar the judgment of a Court of *854 competent jurisdiction. If this.pica-ought to be sustained, and it is far from1* being certain that it ought not, the judgment so pleaded would have acted directly on the revenue of the State, in the hands of its officer. And yet the argument admits, that the action^ in such a case, would be sustained. But, suppose, in such a case,- the party conceiving himself to be injured, instead of bringing an action sounding in damages, should sue1 for the specific tiling, while yet in possession of the seizing officer. It, being admitted, in argument, that the action sounding in damages would lie, we are unable to perceive the line of distinction between that and the action of detinue. Yet the latter action would claim ,the specific article seized for the tax, and would obtain it, should the seizure be deemed unlawful.
It wmuld be tedious to pursue this part of the inquiry farther, and .it would be useless, because every person will perceive that the same reasoning is applicable to all the other enumerated controversies to'which a State maybe a party. The principle may be illustrated by a reference to those other controversies where jurisdiction depends on the party. But, before we review them, we will notice one where the nature of the controversy is, in some degreé, blended with the character of the party.
If a.suit be brought against a foreign minister, the Supreme Court alone has original jurisdiction, áiidthis is shown on the record. But, suppose a suit to be brought7 which affects'the interest of a foreign minister, of by which the person of his se *855 cretary, or of his servant, is arrested. The minister .does not, by the mere arrest of his secretary, or his servant, become a party to this suit, but the actual defendant pleads to the jurisdiction of the Court,, and asserts his privilege. If the suit affects a foreign minister, it must be dismissed, not because he is a party to it, but because it affects him. The language of the constitution in the two cases is different. This Court can take cognizance of all cases “affecting” foreign ministers; and, therefore, jurisdiction does not depend on the party named in the record. But this language changes, when the enumeration proceeds to States. Why this change? The answer is obvious. In the case of foreign ministers,-it was intended, for reasons which all comprehend, to give the national Courts jurisdiction over all cases by which they were in- any manner affected. In the case of States, whose immediate or remote interests were mixed up with a multitude of cases, and who might be affected in an almost infinite variety of ways, it was intended to give jurisdiction in those cases only to which they were actual parties.
In proceeding with the cases in which jurisdiction depends on the character of the party, the first in the enumeration is, “ controversies to which the United States shall be a party.”
Does this provision extend to. the cases where the United States are not named in the record, but claim, and are actually entitled to, the whole subject in controversy?
Let us examine, this question.
Suits brought by the Postmaster-General are *856 for money due to the United States. The nominal plaintiff has no interest in the controversy, and the United States are the only real party. Yet, these suits could not be instituted in the Courts of the Union, under that clause which gives jurisdiction in all cases to which the United States are a party; and it was found necessary to give the Court jurisdiction over them, as being cases arising under a law of the United States.
The judicial power of the Union is also extended to controversies between citizens of different States; and it has been decided, that the character of the parties must be shown on the record. Does this provision depend on the character of those whose interest is litigated, or of those who are parties on the record? In a suit, for example, brought by or against an executor, the creditors or legatees of his testator are the persons really concerned in interest; but it has never been susr pected^ that, if the executor be a resident of another State, the jurisdiction of the federal Courts could be ousted by the fact,' that the creditors. or legatees were citizens of the same State with the opposite party. The universally received construction in this case is, that jurisdiction is neither given nor ousted by the relative situation of the parties concerned in interest, but by the relative situation of the parties, named on the record. Why is this construction universal?. No case can be imagined, in which the existence of an interest but of the party on the record is more unequivocal than in that which has been, just stated. Why, then, is it universally admitted, that this interest, in *857 ino manner affects the jurisdiction of the Court f The plain and obvious answer is, because the jurisdiction of the Court depends, not upon this interest, but upon the actual party on the record.
Were a State to be the sole legatee, it will not, we presume, be alleged, that the jurisdiction of the Court, in a.suit against the executor, would be ■more affected by this fact, than by the fact that any other person, not suable in the Courts of the Union, was the sole legatee. Yet, in such a case, the Court would decide directly and immediately on the interest of the State.
. This principle might be further illustrated by showing that jurisdiction, where it depends on the character of the party, is never conferred in consequence of the existence of an interest in a party' not named; and by showing that, under the distributive clause of the 2d section of the 3d article, the. Supreme Court could never take original jurisdiction, in consequence of an interest in a partv not named in the record.
But the principle seems too well established to require that more time should be devoted to it. It may, we think, be laid down as a rule which admits of no exception, that, in all cases where, jurisdiction depends on the party, it is the party named in the record. Consequently, the 11th amendment, which restrains the jurisdiction granted by the constitution over .suits against States, is, of necessity, limited to those suits in which a State is a party on the record. The amendment has its full effect, if the constitution be construed as it *858 would, have been construed, had the jurisdiction of the Court never been extended to suits brought against a,State, by the citizens of another State, or by aliens.
The State not being a party on the record, and the Court having jurisdiction over those who are parties.on the record, the true question is, not one of jurisdiction, but whether, in the exercise of its jurisdiction, the Court ought to make a decree, against, the defendants; whether they are to be considered as having a real interest, or as being only nominal parties..
In. pursuing the arrangement which the appellants have made for the argument of the cause, this question has already been considered. The responsibility'of the officers of the State for the money-taken out of the Bank, was admitted, and it was acknowledged that this responsibility might be enforced by the proper action. The objection is, to .its being enforced against the specific article taken, and by the decree of this Court. But,, it has been shown, we think, that an action of detinue might he Maintained for that article, if the Bank had possessed the means of describing it, and that the interest of the State would not havé been an obstacle to the suit of the. Bank against the individual in possession of it. The judgment in such a suit might have been enforced, had the article been foupd in possession of the individual-defendant. It has been shown, that the danger of its being parted with, of its being lost to the plaintiff, and .the necessity of a discovery, justified the application to a Court of equity. It was in a *859 Court of equity alone that the relief would be real, substantial, and effective. The parties must ... ■ . . r . certainly have a real interest in the case, since their personal responsibility is acknowledged, 4-n'd, if denied, could be demonstrated.
The decision of the Court in M'Culloch v. Maryland reviewed and confirmed.
It was propér, then, to make a decree against the. defendants in the Circuit Court, if the law of the State of Oliio be repugnant to the constitution, or to a law of the United States made in pursuance thereof, so as to furnish no authority to those who took, or to those who received, the money for which this suit was instituted.
7. Is that law unconstitutional ?
This point was argued with great ability, and decided by this Court, after mature and deliberate consideration, in the case of M‘Culloch v. TState of Maryland. A revision of that has been requested; and many considerations combine to induce a. review of it.
The foundation of the argument in favour of the right of a State to tax the Bank, is laid in the supposed character of that institution. The argument supposes the corporation to have been originated for the management of an individual concern, to be founded upon contract between individuals, having private trade and priyate profit for its great end and principal object.,
If these premises were true, the conclusion drawn from them would be inevitable. This mere private corporation, engaged in its own business, .with its own views, would certainly be subject to the taxing .power of the State, as any individual would be; and the casual circumstance of its being *860 ertiployed by the government in the transaction of its fiscal affairs, would no more exempt its private business from the operation of that power, than it 1 * would exempt the private business of any individual employed in the same manner. ButthepreA mises are not trrte. The Bank is not considered as a private corporation, whose principal object iS individual trade arid individual profit; but as a public Corporation, created for public and national purposes. That the mere bariiness of banking is, irt Ufe OWn nature* a private business, and may be carried on by individuals or companies having nd political connexion with the government, is admitted ; but the Bank is not such an individual or Company. It was not created for its own sake, or for private purposes. It has nefver berin supposed that Congress could create such a corporation. The whole opinion of the Court, in the case of M‘Culloch v. The State of Maryland, is founded on, and sustained by* the idea that the Bank fa an instrument Which is- u necessary and prop!»# fat, carrying into eflfeet the powers vested, hi the go* vermhent of the United States.” Iris not an in» strament which the government found ready made, and W supposed to be adapted to its purposes; but one Which was created in the form in which' it now appears, for.national purposes only. Ifir, undoubtedly, capable of transacting private as Well fts public business. While it is the great iftisiro* ihent by which the fiscal operationS of the government are effected, it is' also trading witb individuals for its own advantage. The appellants endeavour te distinguish between tins tradeniidkrt *861 agency for the public, between its Banking operations and those qualities which it possesses in common . with every corporation, such as individuality, immortality, &c. While they seem to admit the right to preserve’this corporate existence, they deny the right to protect it in its trade and business.
If there be any thing in this distinction, it would tend to show that so much of the act as incorporates the Bank is constitutional, but so much of it as authorizes its Banking operations is unconstitutional. Congress can make the inanimate body, and employ the machine as a depository of, and vehicle for, the conveyance of the treasure of the nation, if it be capable of being so employed, but cannot breathe into it the vital spirit which alone can bring it into useful existence.
Let this distinction be considered.
Why is it that Congress can incorporate or create a Bank ? This question was answered in the case of M‘Culloch v. The State of Maryland. It is an instrument which is “necessary and proper” for carrying on the fiscal operations of government. Can this instrument, on any rational calculation, effect its object, unless it benndowed with that faculty of lending and dealing in money, which is conferred by its charter? If it can, if it be as competent to the purposes of government without, as with this faculty, there will be much difficulty in sustaining that essential part of the charter. If it cannot, then this faculty is necessary to the .legitimate operations of government, and was constitutionally and rightfully engrafted on the institution. It is, in that view of the subject. *862 the vital part of the corporation; it is its soul; and the right to .preserve it originates in the same principle, with the right to preserve the skeleton or body which it animates. The distinction between destroying what is denominated the corporate franchise, and destroying its vivifying principle, is precisely as incapable of being maintained, as a distinction between the right to sentence a human, being to death, and a right to sentence him to a total privation of sustenance during life. Deprive a Bank of its trade and business, which is its . sustenance, and its immortality, if it have that property, will be a very useless attribute.
This distinction, then, has no real existence. To tax its faculties, its trade, and occupation, is to tax the Bank itself? To destroy or preserve the one, is to destroy or preserve the other.
It is urged, that Congress' has not, by this act of incorporation, created the faculty of trading in money; that it had anterior existence, and may be carried on by a private individual, or company, as well as by a corporation. As this profession or business may be taxed, regulated, or restrained, when conducted by an individual, it may, likewise, be taxed, regulated, or restrained, when conducts ed by a corporation.
The general correctness of these propositions need not be controverted. Their particular application, to the question before the Court, is alone to be considered. We do not maintain that the corporate character of the Bank exempts its operations from the action of State authority. If an individual were to be endowed with the same fa *863 Culties, for the same purposes, he would be equally protected in the exercise of those faculties. The operations of the Bank are believed not only to yield the compensation for its services to the go-vernmen-t, b.ut to be essential to the performance of those services. Those operations give its 'value to the currency in which all the transactions of the government are conducted. . They are, therefore, inseparably connected with those transactions. They enable the Bank to render those services to the nation for which it was created, and are, therefore, of the very essence of its character, as national instruments. The business of the Bank constitutes its capacity to perform its functions, as a machine for the money transactions of the government. Its corporate character is merely an incident, which enables it to transact that business more beneficially.
Were the Secretary of the Treasury to be authorized, by law, to appoint agencies throughout the Union, to perform the public functions of the Bank, and to be endowed with its faculties, as a necessary auxiliary to those functions, the operations of those agents would.be as exempt from the control of the States as the Bank, and riot more so. If, instead of'the Secretary of the Treasury, a distinct office were to be created for the purpose, filled by a person who should receive, as á compensation for his time, labour, and expense, the profits of the banking business, instead of other emoluments, tó be drawn from the treasury, which banking business was essential to the operations of the government, would each State in the Union Dossess a right to *864 control these operations ? The question on which this right would depend must always be, are these faculties so essential to the fiscal operations of the government, as to authorize Congress to confer them ? Let this be admitted, and the question, does the right to preserve them exist? must airways be answered in the affirmative.
Congress was of opinion that these faculties were necessary, to enable the Lank to perform the services which are exacted from it, and for which it was created. This was certainly a question proper for the consideration of the national Legislature. But, were it now to undergo revision, who would have the hardihood to say, that, without the employment of a banking capital, those services could be performed ? That the. exercise of these faculties greatly facilitates the fiscal operations of the government, is too obvious for controversy ; and who will venture to affirm, that the suppression of them would not materially .affect those operations, and essentially impair, if not totally destroy, the utility of the machine to the government ? The currency which it circulates., by means of its trade with individuals, is believed to make it a more fit instrument for the purposes of government, than it could otherwise be; and, if this be true, the capacity to carry on this trpde, is a faculty indispensable to the character and objects of the institution.
. The appellants admit, that, if this faculty be necessary, .to make the Bank a fit instrument fear the purposes of the government, Congress possesses the same power to. protect the machine in *865 this, as in its direct fiscal operations; but they deny that it is necessary to those purposes, and insist that it is granted solely for the benefit of the members of the corporation. Were this proposition to be admitted, all the consequences which are drawn from it might follow. But it is not admitted. The Court has already stated its conviction, that without this capacity to trade with individuals, the Bank would be a very defective instrument, when considered with a single view to its fitness for the purposes of government. On this point the whole argument rests.
It is contended, that, admitting Congress to possess the power, this exemption ought to have been expressly asserted in the act of incorporation ; and, not being expressed, ought not to be implied by the Court.
It is not unusual,, for a legislative act to involve consequences which are not expressed. An officer, for example, is ordered to arrest an individual. It is not necessary, nor is it usual, to say that he shall not be punished for obeying this order. His security is implied in the order itself. It is no unusual thing for an act of Congress to imply, without expressing, this very exemption from State cohtrol, which is said to be so objectionable in this instancé. The collectors of the revenue, the. carriers of the mail, the mint establishment, and all those institutions which are public in their nature, are examples in point. It has never been doubted, that all who are employed in them, are protected, while in the line of duty; and yet this protection is not expressed in any act of Congress. It is an* *866 cidental to, and is implied in, the several acts by which these institutions are created, and is secured to the individuals employed in them, by the judi-cjaj pOWer aione ; that is, the judicial power is the instrument employed by the government in administering this security.
That department has no will, in any case. If the sound construction of the act be, that it exempts the trade of the Bank, as being essential to the character of a machine necessary to the fiscal operations of the government, from the control of the States, Courts are as much bound to give it that construction, as if the exemption had been established in express terms. Judicial power, as con-tradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the Court to follow it. Judicial power is never exercised for the purpose of giving effect to. the will of the Judge '; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law.
The appellants rely greatly on the distinction between the Bank and the public institutions, such as the mint or the post office. The agents in those offices are, it is said, officers of government, and are excluded from a seat, in Congress. Not so the directors of the Bank. The connexion of the government with the Bank, is likened to that with contractors.
It will not be Cuntended, that the directors, or . *867 other officers of the Bank, are. officers of government. But it is contended, that,. were their resemblance to contractors more perfect than it is, the right of the State to control its operations, if. those operations be-necessary to its character, as a machine employed by the government, cannot be maintained. Can a contractor. for supplying a military post with provisions, be restrained, from making purchases within any State, or from transporting the, provisions to the place at which the troops were stationed? or could he be fined or taxed for doing so ? We have not yet heard these, questions answered in the affirmative. It is true, that the property of the contractor may be taxed, as the property of other citizens; and so may the local property of the Bank. But we do hot admit that the act of purchasing, or of conveying the articles purchased, can be under State control.
If the trade of the Bank be essential to its character, as a machine for the fiscal operations of the government, that trade must be as exempt from State control as the actual conveyance of the public money. Indeed, a tax bears upon the whole machine; as well upon the faculty of collecting and transmitting the money of the nation, as on that of discounting the notes of individuate.. No distinction is taken between them.
Considering the capacity of carrying on the trade of banking, as ah important feature in the character of this corporation, which was necessary, to make it a fit instrument for the objects fob which it was created, thé Court adheres to its decision in the case of M'Chlloch against The State *868 of Maryland, and ia of opinion, that the act of the State of Ohio, which is certainly much more objectionable than that of the State of Maryland, jg repugnant.to a law of the United States, made in pursuance of the constitution, and, therefore, void. The counsel for the appellants are too intelligent, and have too much self respect, to pretend, that a void act can afford any protection to the officers who execute it. They expressly admit that it cannot.
It being then shown, we think conclusively, that the defendants could derive neither authority nor protection from the act which they executed, and that this suit is not against' the State of Ohio within the! view of the constitution, the State being no party on the record, the only real question in the cause is, whether the record contains sufficient matter to justify the Court in pronouncings decree against the defendants ? That this question is attended with great difficulty, has not been concealed or denied. But when we reflect that the defendants, Osborne and Harper,, are incontestably liable for the full amount of the money taken out of the Bank; thatthe defendant, Currie, is also responsible for the .sum received by him, it having come to his hands with full knowledge of the unlawful means by which it was acquired; that the defendant, Sullivan, is also responsible for the sum specifically delivered to him, with notice that it was the property of the Bank, unless the form of having made an entry on the books of the treasury can countervail the fact, that it was, in truth, kept untouched, in a trunk, by itself, as a deposit, to await. *869 the event of the pending suit respecting it; we may lay it down as a-proposition, safely to be affirmed, that all the defendants in the cause were liable in an action at law for the amount of this decree- ' If the original injunction was properly awarded, for the reasons stated in the preceding part of this opinion, the money, having reached the hands of all those to whom it afterwards .came with notice of that injunction, might be pursued, so long as it remained a distinct deposit, neither mixed with the money of the treasury, .nor put into circulation. Were'it to be admitted, that the original injunction was not properly awarded, still the amended and supplemental bill, which brings before the Court all the parties who had been concerned in the transaction, was filed after the causa of action had completely accrued. The money of the Bank had been taken, without authority; by some of the defendants, and was detained by the only person who was not an original wrong doer, in a specific form; so that detinue might have been maintained for it, had it been in the power of the Bank to prove the facts which- are necessary to establish the identity of the property sued for. Under such circumstances* we think, a Court of equity may afford its aid, on the ground that a discovery is necessary, and also' on the sameprinciple that an injunction issues to restrain a person who has fraudulently obtained possession of negotiable notes» from putting them into circulation; os a person having the apparent ownership of stock really belonging to another, from transferring it. The suit, then, might be as well sustained to a *870 Court of equity as in a Court of law, and the objection that the interests of the State are committed to subordinate agents, if true, is the unavoidable consequence of exemption from being sued— of sovereignty. The interests of the United States are sometimes committed to subordinate agents. It was the case in Hoyt v. Gelston, in the case of The Apollon, and in the case of Doddridge's Lessee v. Thompson and Wright, and in many others. An independent foreign sovereign cannot be sued, and does not appear in Court. But a friend of the Court comes in, and, by suggestion, gives it to understand, that his interests are involved in the controversy. The interests of the sovereign, in such a case, and in every other where he chooses to assert thorn „under the name of the rea1 party to the cause are as well defended as if he were a party to the record. But his pretensions, where they are not well founded, cannot arrest the right of a party having a right to the thing for which he sues. Where the right is in the plaintiff, and the possession in the defendant, the inquiry cannot be stopped by the mere assertion of title in a sovereign. The Court must proceed to investigate the assertion, and examine the title. In the case at bar, the tribunal established by the constitution, for the purpose of deciding, ultimately, in all cases of this description, had solemnly determined, that a State law imposing a tax on the Bank of the United States, was unconstitutional and void, before the wrong was committed for which this suit was brought.
We think, then, that there is no error in the de *871 cree of the Circuit Court for the district of Ohio, so far as it directs restitution of the specific sum of 98,000 dollars, which was taken out of the Bank unlawfully, and was in the possession of the defendant, Samuel Sullivan, when the injunction was awarded, in September, 1820, to restrain him from paying it away, or in any manner using it; and so far as it directs the payment of the remaining sura of 2000 dollars, by the defendants, Ralph Osborne and John L. Harper; but that the same is erroneous, so far as respects the interest on the coin, part of the said .98,000 dollars, it being the opinion of this Court, that, while the parties were restrained by the authority of the Circuit Court from using it, they ought not to be charged with interest. The decree of the Circuit Court for the district of Ohio is affirmed, as to the said sums 98,000 dollars, and 2000 dollars; and reversed, to the residue.
Mr. Justice Johnson.-
The argument in. this cause presents three questions: I. Has Congress granted to the Bank of the United States, an unlimited right of suing in the Courts of the United Sfates ? 2. Could Congress constitutionally grant such a right ? and 3. Has the power of the Court been legally and constitutionally exercised in this suit ?
I have very little doubt that the public mind will’be easily reconciled to the decision of the Court here rendered; for, whether necessary or unnecessary originally, a state of things has now grown up, in some of the States, which renders all *872 the protection necessary, that the general govemment can give to this ÍJank. The policy of the decision is.obvious, that is, if the Bank is to be sus-tajne(j. anc[ few wjjj bestow upon its legal cor*-rectness, the reflection, that it is necessary to test it by the constitution and laws; under which it is rendered.
The Bank of the United States, is now identified with the administration of the national government. It is an immense machine, economically and beneficially applied to the fiscal; transactions of the nation. Attempts have been made to dispense with it, and they have failed ; serious and very weighty doubts have been entertained of its constitutionality, but they have been abandoned; and it is now become the functionary that collects, the depository that holds, the vehicle that transports, the guard that protects, and the agent that distributes and pays away, the millions that pass annually through the national treasury; and all this, not only without expense to the government, but .after paying a large bonus, and sustaining actual annual losses to a large amount; furnishing the only possible means of embodying the most ample security for so immense a charge.
Had its effects, however, and the views of its framers, been confined exclusively to its fiscal uses, it is more than probable that this suit, and the- laws in which it originated, would never have had existence. But it is well known, that with that object was combined another, of a very general) and not less important character.
The expiration of the charter of the former Bank; led to State creations of Banks ; each new Bank m- *873 creased the facilities of creating others; and the necessities of the general government, both to make use of the State Banks for their deposits, and to borrow. largely of all who would lend to them, produced that rage for multiplying Banks, - which, aided by the emoluments, derived to the States in their creation, and the many individual incentives which they developed, soon inundated the country with a new description of bills of credit, against which it was obvious that the provisions of the constitution opposed ho adequate inhibition.
A specie-paying Bank, with an overwhelming capital, and the whole aid of the government deposits, presented the only resource to which the government could resort, to restore that power over the currency of the country, which the framers of the constitution evidently intended to give to Congress alone. But this necessarily involved a restraint upon individual cupidity, and the exercise of State power ; and, in the nature of things, it was hardly possible for the mighty effort necessary to put.down an evil spread so wideband arrived to such maturity, to be made without embodying against it an immense moneyed combination, which could not fail of making its influence to be felt, wherever its claimances could reach, or its industry and wealth be brought to operate. ,
I believe, that the good sense of a people, who know that they govern themselves, and feel that they have no interests distinct from those of their government, would readily concede to the Bank, thus circumstanced, some, if not all the rights here *874 contended for. But I cannot persuade myself, that they.have been conceded in the extent which this decision affirms. Whatever might be proper tQ ^006 ^y an amendment of the constitution, this Court is only, at present, expounding its existing provisions.
In the present instance, I cannot persuade myself, that the constitution sanctions the vesting of the right of action in this Bank, in cases in which the privilege is exclusively personal, or. in any case, merely on the ground that a question might possibly be raised in it, involving the constitution, or, constitutionality , of a law, of the United States.
When law? were heretofore passed for raising a revenue by a duty on stamped paper, the tax was quietly acquiesced in, notwithstanding it entrenched so closely on. the unquestionable power of the States over the law of contracts; but had the same law which declared void contracts not written upon stamped paper, declared, .that every person holding such paper should be entitled to. bring his action ‘‘in any Circuit Court” of the United States, it is confidently beliéved that there could have been but one opinion on the constitutionality of such a provision. The whole jurisdiction over contracts, might thus have been taken from the State Courts, and conferred upon those of the United States. Nor would the evil have rested there; by a similar exercise of power, imposing a stamp on deeds generally, jurisdiction over the territory- of the State, whoever might be parties, even between citizens of the same State — -jurisdiction of. suits instituted for the recovery of legacies *875 or distributive portions of intestates’ estates — jurisdiction, in fact, over almost every possible case, might be transferred to the Courts of the .United States. Wills may be required to be executed on stamped paper ; taxes may be, and have been, imposed upon legacies and distributions; and, in all such cases, there is not only a possibility, but >a probability, that a question may .arise, involving the constitutionality, construction, &c. of a law of the United States. If the circumstance, that the questions which the case involves, are to determine its character, whether those .questions be made in the case or not, then every case here alluded to, may as well be transferred to the jurisdiction of the United States, as those to which this Bank is a party. But still farther,' as was justly insisted in argument, there is not a tract of land in the United States, acquired under laws of the United States, whatever be the number of mesne transfers that it may have undergone, over which the jurisdiction of the Courts of the United States might not be extended l>y Congress, upon the very principle on which the right of suit in this Bank is here maintained. Nor is the case of the alien, put in argument, at all inapplicable. The one acquires its character of individual property, as the other does his political existence, under a law of the United States; and there is not a suit which may be instituted to recover the one, nor an action of ejectment to be brought by the other, in which a ¡light acquired under a law of the United States, does not lie as essentially at the basis of the right of action, as in the suits brought by this Bank. *876 It is no answer to the argument, to say, that the law of the United States is but ancillary to the constitution, as to the alien ; for the constitution» could do nothing for him without the law: and, whether .the question be upon law or constitution, still if the possibility of its arising be a sufficient circumstance to bring it within the jurisdiction of .the United States Courts, that possibility exists with regard to every suit affected by alien disabilities; to real actions in time of peace — to all actions in time of war.
I cannot persuade myself, then, that, with these palpable consequences in view, Congress ever could háve intended to vest in the Bank of the United States, the right of suit to the extent here claimed. And, notwithstanding the confidence with whiqh this point has been argued, an examination of the terms of the act, and a consideration of them with a view to the context;, will be found to leave it by no means a clear case, that such is the legal meaning of the act of incorporation. To be sure, if the act had simply and substantively given the right “ to sue and be sued in the Circuit Courts cf the United States,” there could have been no question made upon the construction of those words. But such is not the fact. The words are, not that the Bank shall be made able and capable in law, to sue, &c., but that it shall, “by a certain name,” be made, able and capable in law to do the various acts therein, enumerated. And these words, under the force of which this suit is instituted, are found in the ordinary incorporating clause of this act, a clause *877 which is well understood to be, and which this Court, in the case of Deveaax, has recognised to be, littl e more than the mere common place or formula ofsuc h an ac.t. The name of a corporation is the symbol of its personal existence; a misnomer there is fatal to ,a suit, (and still more fatal as to other transactions.) By the. incorporating clause, a name is given it, and, with that name, a place among created beings; then usually follows an enumeration of the ordinary acts in which it may personate a natural man; and among those acts, the right to sue and be sued, of which the Court, in Deveaux's case, very correctly remarks, that it is “ a.power which if not incident to a corporation, is conferred by every incorporating act, and is not understood to enlarge the jurisdiction of any particular Court, but to give a capacity to the corporation to appear as a corporation in any Court which would by law have cognizance of the cause if brought by individuals.” With this qualification, the clause in question will be construed, as an enumeration of incidents, instead of a string of enactments; and such a construction, is strongly countenanced by the concluding senten.ee of the section ; for, after running through the whole routine of powers, most -of which are unquestionably incidental, and needed no enactment to vest them, it concludes thus: “and generally to do and execute all and singular the acts, matters, and things, which to them it shall and may appertain to do.” And, in going over the act, it will be found, that whenever it is contemplated to vest a- power not incidental, it is done bv a specific provision, made *878 the subject of a distinct clause; such is that power to' transact the business of the loan-office of the United States: And, indeed, there is one section of the act, which strikingly exhibits the light in which the law-makers considered the incorporating clause; I mean the tenth; which, notwithstanding that the same clause in the seventh section, which is supposed to confer this sweeping power to sue, confers also, in terms equally comprehensive, the power to make laws for the institution, and “ to do and execute all and singular the matters and things, which to them it shall and may appertain to do,” contains an enactment in tho. following words: “that they shall have power to appoint sueh officers, clerks, and servants, under them, for executing the business of the corporation, and to allow them such compensation for their services respectively, as shall be reasonable; and shall be capable of exercising such other powers and authorities for the well governing and ordering the officers of the said corporation, as shall be prescribed by the laws, regulations, and ordinances, of the same a section which would have been altogether unnecessary, had the seventh section been considered as enacting, instead of enumerating and limiting, I consider the incorporating clause, thén, not as purporting the absolute investment of any power, but as the usual and formal declaration of the extent to which this artificial should personate the natural person, in the transactions incident to ordinary life, or to the peculiar objects of its creation ; and, therefore, not vesting the right to sue in the Courts of the United *879 States, but only the right of personating the natural man in the Courts of the United States, as it might, upon general principles, in any other Courts of competent jurisdiction. And’this, I say, is consonant to the decision in Deveaux’s case, and sustained by abundant evidence on the face of the act itself. Indeed, any other view of the effect of the section, converts some óf ^provisions into absolute nonsense.
It has been argued, and I have no objection to admit, that the phraseology of this act has been varied from that incorporating, the former Bank, with a view to'meet the decision in Deveaux’s case. But it is perfectly obvious, that in. the prosecution of that design, the purport of Deveaux’s case has been misapprehended. The Court there decide, that the jurisdiction of the United States depended, (1.) on the character of the cause, (2.) on the character of the parties; that the Judiciary Act confined the jurisdiction of the Circuit-Courts to the second class of cases, and the incorporating act contained no. words that purported to carry it further. Whether the legislative powerof the United States could extend it as far as is here insisted on, or what words \yould be adequate to that'purpose, the case, neither called on the Court to.decide, nor has it proposed to decide. If any thing is to be inferred from that decision on those points, it is unfavourable to the sufficiency of. the words inserted in the present act. For, thé argument of the Court intimates, that where the Legislature propose to give juris* diction to the Courts of the United States, they do *880 it by a separate provision, as in the case of the action of, debt for exceeding the sum authorized to be loaned. And on the words of the incorpo- . A rating section, it makes this remark, “ that it is not understood to enlarge the jurisdiction of any particular Court, but to give a capacity to the corporation to appear as a corporation in any Court, which would by law have cognizance of the cause if brought by individuals. If jurisdiction is given by this clause to the federal Courts, it is equally given to ,all Courts having original jurisdiction, and for all sums, however small they be.” Now, tile difference of phraseology between the former act and the present, in the clause in question, is this: the former has these words, “may sue and be sued, &c. in Courts of record - or any other place whatsoeverthe present act has substituted these words, “in all State Courts having competent jurisdiction, and in any Circuit Court of the United States.” Now, the defect here could not have been the want of adequate words, had the intent appeared to have been, to enlarge the jurisdiction ofPany particular Court. For, if the Circuit Courts were Courts of record, the right of suit given was as full as any other words xould have made it. But, as the Court in its own words assigns the ground of its decision, the clause could not . have been intended to enlarge,the jurisdiction of the State Courts, and therefore could not have been intended to enhirge that of the federal Courts, much less to heve extended it to the smallest sum possible. Therefore, it concludes, that the clause is one of ipere enumeration, coil *881 taining, as it expresses ii, “ the powers which, if not incident to a corporation, aré conferred by every incorporating act, and are not understood to enlarge,” &c. If, then, this variation had in view the object which is. attributed to it, the words intended to answer that object have been inserted so . unhappily as to neutralize its influence ; but, I think it much more consistent with the respect due to the draftsman, who was known to-have been, an able lawyer, to believe that, with such an object in view, he would have pursued a much more plain and obvious course, and given it a distinct and Unequivocal section to itself, or at least have worded it with more marked attention; This opinion is further supported, by considering the absurdities that a contrary opinion would lead to.
A literal .translation of the words in question, is impossible. Nothing but inconsistencies present themselves, if we attempt to apply it without a reference to the laws and constitution of the United States, forming together the judicial system of the. Union- The vvórds are, “ may sue and be sued, &c„ in any State Court having competent jurisdiction, and in any Circuit Court of the United States.” But why should one. member Of the passage be entitled to an enacting effect, and not the residue ? Yet, who will imputé to the Legislature or the draftsman, and intention to vest a jurisdiction by these words'in a State Court? I do. liot .speak of the positive effect; since the failure of one enactment; because of a want either of power to give or capacity to receive, will notcon- *882 trol the'eñ'ect as to any other enactment. I speak of the intent or understanding of the law-maker; who must have used these words, as applicable to the State Courts, in an enacting sense, if we suppose him to have used them' in that sense, as to the Courts of the United States. Yet I should be very unwilling to impute to him,, or to-the Legislature of the country, ignorance'of the fact, that such an enactment, if i.t was one, could not give a right to sue in the State Courts, if the right did not exist without it. Or, in fact, that such enactment was altogether unnecessary, if the legislative power, which must give effect to such an enactment, was adequate to constitute effectually this body corporate. .
But why should this supposed enactment go still farther, and confer the ^capacity to be sued, as well as to sjie,, either in the Courts of the one jurisdiction or the other? Did the, lawgivers suppose that this corporation would not be subject to suit, without an express enactment for that purpose also? Or was it guilty of the more unaccountable mistake, of supposing that it could confer upon individuals, indiscriminately, this privilege of bringing suits in the Courts of the Unitsd States against the Bank ? that too, for a cause of action originating, say, in work and labour, or in a special action on the case, or perhaps, ejectment to try title to land mortgaged by a person not having the estate in him, or purchased of a tortious holder for a banking house ? I cannot acquiesce in the supposition ; and yet, if one is an enactment, and *883 uakes effect as such, they are all enactments, for they are uttered, eodem jlatu.
My own conclusion is, that none of tliein are enactments, but all merely declaratory; or, at most, only enacting, in the words of the Court, in the case of Deveamthat the Bank may, by its corporate name and 'metaphysical existence, bring suit, or personate the natural man, in the Courts specified, as though it were in fact a natural person ; that is, in those cases in which, according to existing laws, suits may be. brought in the Courts specified respectively.
Indeed, a more unrestricted sense given to the words of the act,-could .not. be carried into execution ; a literal exercise of the right of suit, supposed to be granted, would be impossible. Can the Bank of the United States, be sued (in the li- - teral language of the act) “in any Circuit Court of the United States?” in that of. Ohio, or Louisiana, for instance? Locality, in this respect, cannot be denied to such an institution; or, at least,, it is only incidentally, by distress infinite, or attachment* for instance, that .such a suit could be maintained;. Nor, on the other hand, could the Bank sue literally in any Circuit Court of the United States. It must, of necessity, be confined to the Circuit Court of that district in which the de-. fondant resides, or is to be found. And thus, at last, we circumscribe these general words, by reference to the judicial system of the United States, as it existed at' the time. And why the same restriction should not have been imposed, as - to amount, which is imposed as to all other suitors, *884 to wit, 500 dollars and upwards, is to me inscruta-except on the supposition that this clause was not intended for any,other purpose than'that which j jjave su.pp0g!ed. , The United States have suffered no othgr suitors to institute a suit in its Courts for less than that sum, and it is hard to conceive why the Bank should be permitted to institute a suit to recover, if it will, a single cent. ’ This consideration is expressly drawn into notice by this Court, in the case of Devcaitx, and if it was entitled to weight then,' in fixing the construction of the incorporating section, I see no reason why it should be unnoticed now.
I will dwell no longer on a point,, which is in fact' secondary and subordinate; for if Congress can vest this jurisdiction, and the people will it, the act may be amended, and the jurisdiction vested. I next proceed to consider, more distinctly,. the Constitutional question, on the right to vest the jurisdiction tó the extent here contended for.
And here I must observe, that J altogether misunderstood the counsel, who argued the cause for the plaintiff in error, if any of them contended against the jurisdiction, on the ground that the cause involved questions depending, on general principles. No one can question, that the Court whicji has jurisdiction of the principal question, must exercise jurisdiction over every question. Neither did 1 understand them as denying, that if Congress could confer , on the Circuit Courts appellate, they could confer original jurisdiction The argument went to deny the right to assume jurisdiction on a more hypothesis. It was one of *885 description, identity, definition; they. contended, that until a qiiestion involving the construction or administration of the laws of the United States did actually arise, the casus federis was presenied, on which the constitution authorizéd the government to take to itself the jurisdiction of the cause. That until such a question actually arose, until such a case was actually presented, non constat, but the cause depended upon general principles, exclusively cognizable in the State Courts ; that neither the letter nor the spirit of the constitution sanctioned the assumption of jurisdiction on the part of the United States at any previous stage.
And this doctrine has my hearty concurrence in its general application. A very simple case may be stated, io illustrate its bearing on the question of jurisdiction between the two governments. By virtue of treaties with Great.Britain* aliens holding lands were exempted from alien disabilities, and made capable of holding, aliening, and transmitting their estates, in common with riativesi But why should the claimants of such lands, to. all eternity, be vested with the privilege of bringing an original suit in the Courts of the United States? It is true, a qiiestion might be made, upon the effect of the treaty, on the rights- claimed by or through the alien'; but until that question does arise^ nay, until a decision against the right takes, place, what end has the United States to subserve in claiming jurisdiction of the cause ? Such is the present law of the United States, as to all but this one distinguished party \ and that law was *886 passed when the doctrines, the views, and ends of constitution, were, at least, as well understood as they are at present. I attach much importance j.Q ^ ^5th section of the judiciary act, not only as a measure of policy, but as a cotemporaneous exposition of the constitution on this subject; as an exposition of the words of the constitution, deduced from a knowledge of its views and policy. The object was, to secure a uniform construction and a steady, execution of the laws of the Union. Exceptas far as this purpose might require, the general government had no interest in stripping the State Courts of their jurisdiction,; their policy would rather lead to avoid incumbering themselves with it. Why then should it be vested with jurisdiction in a thousand caí scs, on a mere possibility of a question arising, w.ich question, at last, does not occur in one of them ? Indeed, I cannot perceive how such a reach of jurisdiction can be asserted, without changing the reading of the constitution on this subject altogether. The judicial power extends only to “cases arising,” that is, actual, not potential cases. The framers of tlie constitution knew better, than to trust such a quo minus fiction in the hands of any government.
I have never understood any one to question the right of Congress to vest original jurisdiction in its inferior Courts, in cases coming properly within the description of “cases arising under the laws of the United States;” but surely it must first be ascertained, in some proper mode* that the cases are. such as the constitution describes. By possibility, a constitutional question may be raised in *887 any conceivable suit that may be instituted; but that would be % very insufficient ground for assu- , , ming universal jurisdiction; and yet, that a question has'been made, as that, for instance, bn the Bank charter, arid may again be made, seems still worse,, as a ground for extending' jurisdiction. For, the folly of raising it again in every suit instituted by the Bank, is too great, to suppose it possible. Yet this supposition, and this alone, would seem to justify vesting the Bank with an unlimited right to sue in . the federal Courts. Indeed, I cannot perceive how, with ordinary correctness, a question can be said to be involved in a cause, which only may possibly be made, but which, in fact, is the very last question that there is any probability will be made ; or rather, how that can any longer be denominated a question, which has been put out of existence by a solemn decision. The constitution presurnes, that the decisions of th,e supreme tribunal will be acquiesced in; and after disposing of the few questions which the constitution refers to it, all the minor questions belong properly to the State jurisdictions, and never were intended to be takeri away. iri mass.
Efforts have been made to fix the precise sense of the constitution, when it vests jurisdiction in the general government, in “ cases arising under the laws of the TJnited States.” To me, the question appears suscéptible of a. very simple solution; that all depends upon the identity of tile case supposed.; according to which idea, a case may be such in its very existence, Or it may become such in its progress. An action mav «live, move, and have *888 its being,” in a law of the United States; such is that given for the violation of a patent-right, and four or five different actions given by this act of incorporation; particularly that against the President and Directors for over-issuing; in all of which cases the plaintiff must count' upon, the law itself as the ground of his action. And of the other description, would have been an action of trespass, in this casé, had remedy been sought for an actual levy of the tax imposed. Such was the case of the former Bank against Deveaux, and many others that have occurred in this Court, in which the suit, in its form, was such as occur in ordinary cases, but in which the pleadings or evidence raised the question on the law or constitution of the United States. In this class of cases, the occurrence of a question makes the case, and transfers it, as provided for under the twenty-fifth section of the'Judiciary Act, to the jurisdiction of the United States. And this appears to me to present :the only sound and practical construction of the constitution ou this, subject; for no other cases does it regard as necessary to place under the control of the general government. It is only,when the cáse exhibits one or the other of these characteristics, that it is acted upon by the constitution. Where no qtfés-. tion is raised, there can be no contrariety of construction; and what else had the constitution to guard against ? As to cases of the first description, ex necessitate rei■, the Courts of the United States must be susceptible of original jurisdiction; and as to all other cases,, I should hold them, also, susceptible of original jurisdiction, if it were prac *889 licable, in the nature of things, to make out the definition of the case, so as to bring it under the constitution judicially, upon an original suit. But until the plaintiff can control the defendant in his pleadings, I see no practical mode of determining when the case does occur, otherwise than by permitting the cause tó advance until the case for which the constitution provides shall actually arise. If it never occurs, there can be nothing to complain of; and such are the provisions of the twenty-fifth section. -The cause might be transferred to the Circuit Court before an adjudication takes place; but I can perceive no earlier stage at which it can possibly be predicated of such a case, that it is one within the constitution; nor any possible necessity for transferring it then, or until the Court has acted upon it to the prejudice of the claims of the United States. It is not, therefore, because'Congress may not vest fin original jurisdiction, where they can constitutionally vest in the Circuit Courts appellate jurisdiction, that I object to this general grant of thé right to sue.^; but, because that the peculiar nature of this jurisdiction is such, as to render it impossible to exercise it in a strictly original form, and because the principle of a possible occurrence of a question as a ground of. jurisdiction, is transcending the bounds of the constitution, and placing it on a ground, which will admit of an enormous accession, if not an unlimited assumption, of jurisdiction.
But, dismissing the question of possibility, which, I must think, would embrace every other case as well as those to which this Bank is a party, in what *890 sense can it be predicated of this case, that it is one arising under a law of the United States? It cannot be denied, that jurisdiction of this suit m eqUjty fcoyjd not be entertained, unless the Court could have had jurisdiction of the action of trespass, which this injunction was intended to anticipate. And, in fact, there is no question, that the Bank here maintains, that the right to sue extends to common, trespass, as well as to contracts, or any . other cause of action. But suppose trespass in theTcommon forrii. instituted; the declaration is general, and, the defendant pleads not guilty, and goes to trial. Where is the feature in. such a cause that can give the Court jurisdiction ? What question arises under á law of the United States? or what question that must not be decided exclusively upon the lex loci, upon State-laws ? Take also the casé of a contract, and'in what sense can it be correctly predicated of that, that in common with every ^other act of the Bank, it arises out of the, law that incorporates it ? . May it not with eqqal propriety be asserted, that all the crimes and all the controversies of mankind, arise out of the fiat that called their progenitor into existence ? It is not'because man was created, that he commits a trespass, or.incurs a debt; but because, being.indued with certain faculties and propensities, he is led by an appropriate motive to the one action or the otjier. Sound philosophy attributes eifects to their proximate causes. It is but pursuing the grade of creation from one step to another, to deduce the acts of this Bank from State law, or even divine law» with as much correctness as from the law of *891 its immediate creation. Its contracts arise under its own acts, and not under a law of the United States; so far from it, indeed, that their effect, their construction, their limitation, their concoction, are all the creatures of the respective State laws in which they originate. There is-a satisfactory illustration of the distinction between contracts which draw their existence from statutes, and those which originate in the acts of man, afforded by this act of incorporation itself. It will be unnecessary to. look beyond it. The action of debt before alluded to, give® by the ninth clause of the seventh section, against the directors, to any one who will sue, is one of those factitious or statute contracts which exist in, and expire with, the statute that creates it. Not so with the ordinary contracts of the Bank; upon the expiration of the ' charter, they would be placed in the state of the credits of an intestate before administration; there is no one to sue for them; but the moral obligation would remain, and a Court of equity would enforce it against their debtors, at the suit of the individual stockholders. Nor would this be on the principle of contracts executed under power of attorney; for, the law applicable to principals would govern every question in such causes. All the acts of the corporation are executed their own right, and not' in the right of another. A personal existence, with all its incidents, is given to them, and it is in right of that existence that they are capable of acting, and do act.
Not, indeed, in another point of view, is it strictly predicable of this Bank, that its acts arise , *892 out of, because its existence is drawn from, a law of the United States. It is because it is incorporad ted, not because incorporated by a law of the United States, that it is made capable of exercising certain powers incidentally,. and of being vested with others expressly. The same effects would follow, if incorporated by any other Competent legislative power. The law of the. United States creates the Bank, and the common law, or State law more properly, takes it up and makes it what it is. Who can deny, that in many points the incidents to such an institution may vary in different States*,, although its existence be derived from the general goverpment? It is the case with the natural alien, when adopted into the national family. His rights, duties, powers, &c., receive always a shade from the lex loci of the State in which he fixes his domicil.
If this right to sue could be vested at all in the Bank,, it is-obvious that it must have been for one or more of three causes: 1. That a law of the United States incorporated it; 2. Thata.law of the United States vested in it the, power to sue; or, 3. That the power to defend itself from.trespasses as applicable to this, case strictly, or to contract debts as applicable to the Georgia case, was conferred on it by a law of the United States expressly.
The first I have considered. On the second, no one would havé the hardihood to contend, that such a grant has any efficacy, unless the suits, come within the description of cases arising .under a law of the United States, independently of the *893 grant of the right to sue; and it only remains to add a few more remarks on the third ground.
.Of the power to repel trespasses, and to enter into contracts, as mere incidents to its creation, I trust I have shown, that néither comes within the description of a case arising .under a law .of the United States. But where will we find, in the law in question, any express grant of power relative to either ? The contracts on which the Georgia case is founded, are declared on as common promissory notes, payable to bearer. Now, as mere incidents, I have no doubt of an action being sustainable in a State Court in both cases, But if an express grant is relied on, as bringing this, .or the case of a contract, within the description of “ a case arising under a law of the-United States,” then I look through the' law in vain for any express grant, either to make the contract, or repel the trespass. It is true, the sweeping terms with which-the incorporating section concludes, import, that “by that name it shall and may be lawful for the Bank to do and execute all and singular the acts, matters, and things, which to them it shall and may appertain to do.” But this contains no grant of either, since the inquiry, at last, must be into the incidents of such an institution, and, as incidents, they needed not these words to sustain them; nor could those words give any more force, to the right. So that, at last, we are referred to the mere fact , of its corporate existence,, for the basis,.of either of the actions, or either of, the powers here insisted on, as bringing this , cause within the constitutional definition. Having a |e- *894 gal existence as an incorporated banking institiu tion, it has a right to security in its possessions, and to the performance of its contracts ; but that right will be precisely the same, if incorporated by a State law, or even, as was held in the case of Terreit v. Taylor, if having a common law corporate existence. The common law, or the''State law, is referred to by the law of the United States, as the source of these incidents, when it speaks of the ácts which are appurtenant to it; and 1 know of no other law that can define them, or confer them as incidents. Suppose a naturalization act passed, which, after specifying the terms, and conditions upon which an alien shall become a citizen, proceeds to declare, “that, as a citizen, he shall lawfully do and execute all and singular the acts, matters, and things, which to * á citizen,’ or ‘to him as a citizen,’ it shall and may appertain to do,” would not' these words be a mere nullity ? His new existence, and the relations with the society into which he is introduced, that grow out of that con-nexion, give him the right to defend his property or his existence, (as in this case,) and to enter into and enforce those contracts which, as an alien, he would have been precluded from. He was no more a citizen, without an act of Congress, than this was a Bank. Finally, after the most attentive consideration of this cause, I cannot help thinking, that this idea Of taking jurisdiction upon an hypothesis, or even of assuming original, unlimited jurisdiction, of all questions arising under a law of the United States, involves some striking inconsistencies. A Court may take cognizance of a ques *895 tion in a cause, and enter a judgment upon it, and yet not have jurisdiction of the cause itself. Such are all questions of jurisdiction, of which every Court, however limited its jurisdiction, must have cognizance in every, cause brought before it.. So, also, I see not why, upon the same principle, a law expressly violating the constitution, may not be made the groundwork of a transfer of jurisdiction. Cases may arise, and would arise, under such a law.; and if the simple existence, or possibility of such a case, is a sufficient ground of jurisdiction, and that ground sufficient to transfer the whole case to the federal judiciary, the least that can be said of it is, that it was not a case within the mischief intended to be obviated by the constitution. I shall say no more on this subject, but proceed to one which also acts forcibly on my judgment in forming my opinion in this cause.
I will not undertake to define the limits within which the discretion of the Legislature of the Union may range, in the adoption of measures for executing their constitutional powers. It is very possible, that in the choice of means as “ proper and necessary” to carry their powers into effect, they may have assumed a- latitude not foyeseen at the adoption of the constitution. For example, in order to collect a stamp duty, they have exercised a power over the general law of contracts; in order to secure debts due the. United States, they have controlled the State laws of estates of deceased persons and of insolvents’ estates; in the distributions and the powers of individuals themselves, when insolvent, in the assignment of their *896 own estates; in the exercise of various powers, they have taken jurisdiction over crimes which the State laws took cognizance of; and all this, being within the range of their discretion, is aloof from judicial control, while unaffectedly exercised for the purposes of the constitution. Nor, indeed, is there much to be alarmed at in it, while the saíne people who govern the States, can, where they will, control the. Legislature of the United States.
Yet, certainly, there is one limit to this chain of implied powers, which must lie beyond the reach of legislative discretion. No one branch . of the general government can new model the constitutional structure of the other.
Much stress was laid, in the argument, upon the necessity of giving co-ordinate extent to the several departments of a government; but it was altogether unnecessary to bring this consideration into the present case. As a ground of policy, this is not its proper place; and as a ground of construction, it must be needless, when applied to a con - stitution in which the judicial power so very far transcends both the others, in its acknowledged limits.
The principle is, that every government should possess the means of protecting itself; that is, of construing and enforcing its own laws. But this is not the half of the extent of the judicial power, of the Union. Ita most interesting province, is to enforce the equal administration of laws, and systems of laws, over which the legislative power can exercise no control. And thus, the judicial power is distributed into the two *897 classes : . 1. That which is defined by the circumstances 'o.f the case ; and, 2. That which depends upon the circumstances of the person. On the fi*st, I have endeavoured to show, that the end is adequately effected by the provisions of the 25th section of the Judiciary Act, and, practically, can be exercised in no other way. But with regard to. the second class, the argument turns against the United States ; and every reason that may be urged in favour of eking out the jurisdiction in. the first class of cases, reacts forcibly to confine the jurisdiction strictly within its constitutional limits, as to the second class. When the alien, or the citizen of another State, or the grants of another State, are implicated, the State Courts open their tribunals to the judiciary of the United States, and recognise their power as co-ordinato. Their citizens, their territory, their laws, all are subjected to a power quite foreign to the States, and judicial power is literally poured out upon the Courts of the Union, without stint.
How interesting, then, is it to the States, that the number of those persons who claim the privilege of coming into the Courts of the .United States shbuld be strietly limited ! Cases, since tjjrey arise out of laws, See. of the United States, muiff.be very limited in number; but persons may bripg intq the; Courts of the United States any question ,and every question, and, if this law be correctly construed, for any, the very smallest possible amount.
But if the plain dictates of our senses be relied on, what state of facts have we exhibited here ? *898 Making a person,makes a case; and thus, a government which cannot exercise jurisdiction unless an alien or citizen of another State be a party, makes a party which is neither alien nor citizen, and then claims jurisdiction because it has made a case. If this be true, why not make every citizen a corporation sole, and thus bring them all into the Courts of the United States quo mimis? Nay, it is still worse, for there is not only an evasion of the constitution implied in this doctrine, but a positive power to violate it. Suppose every individual of this corporation were citizens of Ohio, or, as applicable to the other case, were citizens of Georgia, the United States could not give any one of them, individually, the right to sue a citizen of the same State in the Courts of the United States; then, on what principle could that right be communicated to them in a body? But the question is equally unanswerable, if any single member of the corporation is of the same State with the defendant, as has been repeatedly adjudged.
One of the counsel who aigued this cause in behalf of the Bank, has denominated it a bundle of faculties. This is very true ; but those faculties are substituted for the organization of a natural person.; and it is perfectly certain, that when it comes into this Court, it must be treated "ás a person! It is altogether inadmissible, to refine away the principles of jurisprudence, so as to consider it in any other light than that of a person. As such, it sues out á writ, declares, pleads,, takes judgment, and levies, an exéoútion. Ifit is not a *899 person, it has no standing in this Court; it must, therefore, abandon this suit, or be subjected to personal disabilities. Gentlemen have a right to take what ground here they please, to sustain this action ; but it is perfectly clear to me, that the act of Congress was intended to vest this right as a personal right, or not at all. Let any one look through this act, and notice the unrestricted latitude that has been assumed in vesting the right to . sue both by and against this Bank, and he will see, that either there is no general right to sue given in the seventh section, now relied on, or that it is given under the general power granted to pass all laws necessary to carry the powers of the general government into execution!. The proviso to the 17th section is a remarkable proof of this. It puts the limits of judicial power altogether out of view. If Congress, in legislating on this subject, did intend such a grant as is here contended for, it must be presumed that they did not advert to the consideration, that granting to an individual a right to sue, was enlarging the jurisdiction of the Court. It never can be supposed, that they, meant to assume the power of adding to the number of persons who might constitutionally become suitors in the Courts of the United States. But every difficulty vanishes, when we limit the meaning of the language of the act, by a reference to the context. In fact, a general power to bring actions in the Courts of the United States, is so peculiarly and explicitly personal on the face of the constitution, that it is hard to perceive how Congress could have for a moment lost sight of the restric *900 tions imposed, in this respect, upon the judicial p°w7er-
Nor had the Bank any idea that this power was vested in it, upon the ground that every possible case in which it might be involved in litigation, came within the constitutional definition of cases arising under laws, &c. of the United States. In its averments, those on which it claims jurisdiction, it simply takes two grounds : 1. That it was incorporated by an act of Congress ; 2. That the right to sue was given it by an act of Congress. But there is no averment, that the cause of action was a case arising under a law of the United States. It well knew, that it was ,a case emphatically arising put of an act of the -State of Ohio, operating upon the domicil of the Bank, which, although purchased in right of an existence metaphysically given it by Congress, was acquired and held according to the laws of Ohio, acting upon its own territory. Technically, these averments cover only two grounds ; they affirm, 1. That the Bank, being incorporated by Congress, had, therefore, a right to sue ; 2. That being incorporated, and having the right to sue conferred upon it by an act of Congress, therefore, it could maintain this action. But yet neither, nor both of these, could give the right, unless in one of the cases defined in the constitution, which case is not the subject' of an averment. I would not willingly place the-case on the ground of mere technicality; and, therefore, only make the observation to show, that the ground assumed in argument, is an afterthought. I believe that, until this argument, .the *901 ground now made was never thought of; and I am at a loss to conceive how it is possible to maintain, i ■ • . ,, ... • ,, . the position, that all possible cases m which this Bank shall sue or be sued, come within the description now contended for. Take, for instance, a trespass or a fraud committed by the Bank, and suit brought by the injured party, in what sense could they be said to be cases arising under a law oif the United States ? Or, take the case of ejectment, suppose to recover part of the premises of the banking house in Philadelphia, and not a <plestion raised in the suit, but what arises under the territorial laws of the country, and what circum-. stances characterize that as a case of the pri&per description to give this Court jurisdiction P If this caúse of action arises under a statute, why is not the statute referred to, and the provision particularly relied on, if there is any other than what the averments specify ?
Various instances have been cited and relied on, in which this right of suit in the Courts of the United States has been given to particular officers of the United States. But on these I would remark, that it is not logical to cite as proofs, the exercise of this right,, in instances which may themselves be the subject of constitutional questions. It cannot be intended to surprise this Court into the recognition of the constitutionality of the laws So cited. But there is a stronger objection; no such instance is in point, until it be shown that Congress has authorized such officers to bring their private contracts and private controversies into the. Courts of the United States. In all the *902 cases cited, the individual is acting distinctly as the organ of government; but let them take the character , óf a mere contractor, a factor, a broker, a common carrier, and then let laws authorizing them to sue in the Courts of the United States be passed, and I will acknowledge the cases to be in point; though I will still dispute the principle, that a repetition of error can convert an act into law or truth. The distinction is a clear one between all these cases and the Bank. The latter is a mere agent <?r attorney, in some instances; in ‘others, and especially in the cases now before the Court, it is a private person, acting on its own account, not clothed with an official character at all. But the acts of public officers are the acts of government ; and emphatically so, in suits by the Postmaster-General; the money to be recovered being the property of the United States, it may be considered that they are parties to the suit, just as those States are to the suits by or against their Attorney-General, where he is by law authorized to bring and defend suits in his own name officially. When the United States are parties, the grant of jurisdiction is general. But, there is express law also for every contract that the Postmaster enters into, or it will be in vain for him to bring his suit in his own name or otherwise. It would be in vain for him to rely simply on his being made Postmaster under an act of Congress; in which point alone, there would seem to exist, any analogy between his case and that of the Bank.
As to the instance of the action given under the patent law, it has been before remarked, that s.o *903 entirely is its existence blended with an act of Congress, that to prosecute it, it is indispensable that the act should be set forth as the ground of T , , . . . c . ° action. I rather think it an unfortunate quotation, since it presents a happy illustration of what we are to understand by . those cases arising under a law of Congress, which in their nature admit of an exercise of original jurisdiction. The plaintiff must recover, must count upon the act of Congress; the constitutional characteristic appears on the record before the defendhnt is called to answer; and the repeal of the statute before judgment, puts an end to his right altogether. Various such causes may be cited. But how the act of Congress is to be introduced into an action of trespass, ejectment, or slander, before the defendant is called to plead, I cannot imagine.
Upon the whole, I feel compelled to dissent from the Court, on the point of jurisdiction ; and this renders it. unnecessary for me to express my sentiments on the residue of the points in the cause.
Decree affirmed, except as to interest on the amount of the specie in the hands of the defendant, Sullivan.

 1 Mad.154,155.